IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

RICKY RAYMOND, et al.,           §
                                 §
        Plaintiffs,              §
                                 §
v.                               §        CIVIL ACTION NO. H-05-4149
                                 §
UNIVERSITY OF HOUSTON,           §
                                 §
        Defendant.               §

## MEMORANDUM OPINION

Pending before the court[1] is Defendant's Motion for Summary Judgment, Docket Entry No. 47.  The court has considered the motion, all relevant filings, and the applicable law.  For the reasons set forth below, the court **GRANTS IN PART** and **DENIES IN PART** Defendant's motion.

### I.  Case Background

#### A.  Factual History

Plaintiffs filed this discrimination action against Defendant, University of Houston, where they were students in the Graduate College of Social Work ("GCSW")[2] Doctoral Program.[3]  In their complaint, Plaintiffs identified the following as the legal bases for their action:  the Equal Protection Clause and the Due Process

---

[1]    The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  Docket Entry Nos. 21, 23, 24.

[2]    Previously the Graduate School of Social Work, the department also may be identified as GSSW in this Memorandum and Recommendation.  See Defendant's Answer, Docket Entry No. 8, p. 2.

[3]    See Plaintiffs' Original Complaint, Docket Entry No. 1, pp. 1, 3.

Clause of the U.S. Constitution[4] pursuant to 42 U.S.C. § 1983 ("Section 1983"); Title VI of the Civil Rights Act of 1964[5] ("Title VI"); Title IX of the Education Amendments of 1972[6] ("Title IX"); and Section 504(a) of the Rehabilitation Act[7] ("Section 504").[8] In their complaint, Plaintiffs provided details about the GCSW Doctoral Program's history, goals, and methods and about the Center for Students with Disabilities' ("CSD") purpose, but very little about the Plaintiffs' experiences at GCSW.[9]  The entire factual background specific to the Plaintiffs is as follows:

> Plaintiffs Ricky Raymond and Virginia Lara were dismissed December 2003.  Plaintiff Donald Eubanks[] was constructively dismissed in May 2004.  Plaintiffs Ricky Raymond and Virginia Lara filed complaint[s] of discrimination with [the] United States Department of Education--Office for Civil Rights in May 2004[,] and Plaintiff Donald Eubanks filed in June 2004.  Plaintiffs received no relief through this process.  Because there is no mechanism in place that provides for the plaintiff[s'] grievances to be fairly addressed in accordance with their constitutional rights[,] all other options other than court action are foreclosed.[10]

> Plaintiffs complained that Defendant discriminated against

them by dismissing them from the program, by not providing them

---

[4]     U.S. Const. amend. XIV, § 1.

[5]     42 U.S.C. 2000d.

[6]     20 U.S.C. § 1681.

[7]     29 U.S.C. § 794.

[8]     See Plaintiffs' Original Complaint, Docket Entry No. 1, pp. 1-2, 8-10.

[9]     See id. at pp. 5-7.

[10]     Id. at pp. 7-8.

2

with the same opportunities for reinstatement that were provided to others outside of Plaintiffs' protected classes, by grading their examinations based on illegal animus, by failing to investigate grievances of discrimination, and by failing "to graduate minority students and males at a rate similar to that of white females."[11] Plaintiffs offered no other details on the specific experience of each plaintiff.[12]  If fact, although Plaintiffs claimed that Defendant's discriminatory practices were based on race, sex, national origin, and disability, they failed to identify which type of animus allegedly was directed at which plaintiff.[13]

The court gleans more details from the summary judgment evidence.

**1.  GCSW Program**

According to the 2004 Doctoral Student Handbook, the award of a doctoral degree was based on the successful completion of three steps: coursework, comprehensive examinations, and dissertation.[14] Each student had to pass a minimum of forty-eight hours of

---

[11]    See id. at pp. 8-9.

[12]    See id. at pp. 5-10.

[13]    See id. at pp. 1-12.

[14]    Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 1, Doctoral Student Handbook, pp. 18-32.   The 2004 handbook, which Defendant submitted, was effective in the spring of 2004 after the dismissal of Plaintiffs Raymond and Lara.   See id. at p. 1.   The court is not concerned by this fact, however.   The information herein derived from the handbook is general, and Plaintiffs do not claim that it differs from the handbooks that governed their years of attendance.

coursework.[15]   After completing the required coursework with a B average or higher, a doctoral student sat for the comprehensive examinations, which were "designed to demonstrate a student's competence in the application and synthesis of the theory and knowledge base in the field of social work."[16]  Administration of the examinations was in two parts, one closed book and one take home.[17]  Together, the examinations had four separate sections:  the closed-book portion covered social work policy, practice, and research; the take-home portion was integrative.[18]   Students were allowed three hours for each of the closed-book sections and one week for the take-home portion.[19]

Each section of the examinations was graded anonymously by two faculty members.[20]   If the two graders disagreed on whether the student passed a particular section, a third faculty member graded it.[21]   A passing grade of 80 or higher on each of the four sections

---

[15]     Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 1, Doctoral Student Handbook, pp. 6, 18.

[16]     Id. at p. 24.

[17]     Id. at pp. 24-25.

[18]     Id.; Ex. 5A, Deposition of Maxine Epstein dated Jan. 27, 2009, p. 40.

[19]     See Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 5A, Deposition of Maxine Epstein dated Jan. 27, 2009, pp. 46-47.

[20]     Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 1, Doctoral Student Handbook, p. 25.

[21]     Id.

was necessary to remain in the program.[22]   One retake on each
section was allowed.[23]   From at least 2001 until the fall semester
of 2004, the GCSW had an unwritten practice of allowing a student
who failed only one section of the examinations on the second try
to have a third chance to pass that section.[24]

Upon passing the comprehensive examinations, the student
entered into the dissertation phase of the program.[25]   The student
was "responsible for organizing a dissertation committee,
developing a dissertation proposal, and completing the
dissertation."[26]   Doctoral candidates were required to complete all
three degree requirements within ten years of enrollment.[27]

The 2004 Doctoral Student Handbook also included a statement
of non-discrimination, information on its grievance procedure and
forms, and a description of services provided to disabled
students.[28]  With regard to students with disabilities, the handbook
explained that those who needed special accommodations should

---

[22]    Id.

[23]    Id.

[24]    Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 3,
Letter re: complaint 06042086 from Stacy Lara to Jay Gogue dated Apr. 8, 2005,
p. 3.

[25]    Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 1,
Doctoral Student Handbook, p. 25.

[26]    Id.

[27]    Id. at p. 6.

[28]    See id. at pp. 11-17.

contact the CSD and that appropriate accommodations would be determined by a team including "the [CSD], the student, the Academic Accommodations Evaluation Committee, and at times instructors, as appropriate."[29]  A student who wished to file a grievance based on the unfair denial of an accommodation request was to appeal the denial to the department chair, the college dean, and the provost, in that order.[30]  The handbook did not provide any method for the reinstatement of a student after dismissal from the doctoral program.[31]

All three of the plaintiffs began the doctoral program in 2000.[32]  Maxine Epstein ("Dr. Epstein") became the doctoral program director in January 2002.[33]  For the four school years from 2000 through 2004, which covers the time frame the Plaintiffs were in the program, an average of just over thirty-seven students enrolled

---

[29]    Id. at p. 17.

[30]    Id.

[31]    See id. at pp. 1-48; Ex. 3, Letter re: complaint 06042086 from Stacy Lara to Jay Gogue dated Apr. 8, 2005, p. 3; Ex. 4, Letter re: complaint 06042069 from Stacy Lara to Jay Gogue dated Apr. 8, 2005, p. 3.

[32]    See Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 3, Letter re: complaint 06042086 from Stacy Lara to Jay Gogue dated Apr. 8, 2005, p. 3; Ex. 4, Letter re: complaint 06042069 from Stacy Lara to Jay Gogue dated Apr. 8, 2005, p. 3; Ex. 8, Deposition of Plaintiff Lara, p. 10; Ex. 13, Deposition of Plaintiff Eubanks, p. 8; Plaintiffs' Response to Defendant's Motion for Summary Judgment, Docket Entry No. 54, Ex. 2 (unnumbered), Verification of Plaintiff Lara, ¶ 2.

[33]    See Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 5A, Deposition of Maxine Epstein dated Jan. 27, 2009, pp. 52-53.

6

each year, for a total of 149 students.[34]   Of that total, approximately one-third were male, approximately one-half were white, approximately one-quarter were African American; and approximately one-seventh were Hispanic.[35]  Of the twenty-three students who took the comprehensive examinations during those years, eighteen passed (approximately seventy-eight percent).[36]  By demographics, approximately eighty-five percent of female students passed; seventy-five percent of male students passed; ninety percent of white students passed; sixty percent of African-American students passed; and seventy-five percent of Hispanic students passed.[37]  Neither of the two disabled test takers passed.[38]

In the November 2008, after a couple of years of research and discussion, Defendant introduced a new qualifying examination that replaced the comprehensive examinations.[39]  The new examination covered the concepts of policy, practice, and research in the

---

[34]     Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 2, Doctoral Student Enrollment by Race, Ethnicity and Gender: 2000-2001, 2001-2002, 2002-2003 and 2003-2004, p. 1 (unnumbered); see also Ex. 5A, Deposition of Maxine Epstein dated Jan. 27, 2009, p. 53 (stating that the program had between thirty-six and forty-two students at any particular time).

[35]     See Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 2, Doctoral Student Enrollment by Race, Ethnicity and Gender:  2000-2001, 2001-2002, 2002-2003 and 2003-2004, p. 1 (unnumbered).

[36]     See id.

[37]     See id. at p. 2 (unnumbered).

[38]     See id.

[39]     Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 5A, Deposition of Maxine Epstein dated Jan. 27, 2009, pp. 42, 43.

format of a research grant application.[40]   Like the integrated section of the old comprehensive examinations, the qualifying examination was a take-home test.[41]   Defendant's objective was that the qualifying examination would serve as the first step in the student's dissertation process.[42]

### 2.  Plaintiff Raymond

Plaintiff Raymond, an African-American man, earned a Master of Social Work from GCSW in 2000 and began the doctoral program in the fall semester of that same year.[43]   After successfully completing all of the required coursework, he took the comprehensive examinations in March 2003.[44]   In response to the submission of a Request for Individualized Testing Accommodations ("RITA") form, Defendant allotted Plaintiff Raymond, who suffered from bipolar disorder, an additional thirty minutes per section of the closed-

---

[40]     Id. at pp. 45-46.

[41]     Id. at p. 48.

[42]     See id. at pp. 48-49.

[43]     Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 4, Letter re: complaint 06042069 from Stacy Lara to Jay Gogue dated Apr. 8, 2005, pp. 1, 3.   Although this letter clearly relates to Plaintiff Raymond's discrimination complaint to the United States Department of Education Office of Civil Rights, nowhere within the letter is he identified by name.  If the court's identification is incorrect, the parties should notify the court immediately.

[44]     Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 4, Letter re: complaint 06042069 from Stacy Lara to Jay Gogue dated Apr. 8, 2005, p. 3.

book portion.[45]   Despite the additional time, Plaintiff Raymond

failed all four sections of the examinations.[46]

In June 2003, Plaintiff Raymond met with staff of the CSD to

discuss allowing him additional time when retaking the

examinations.[47]  When he retook the test in October 2003, Defendant

allowed him seven hours for each of the closed-book sections, twice

as much time as when he first took the examinations.[48]   Plaintiff

Raymond failed two sections--research and integrative.[49]   As a

result, Defendant dismissed Plaintiff Raymond from the doctoral

program.[50]  Plaintiff Raymond requested reinstatement to no avail.[51]

Plaintiff Raymond filed a complaint with the United States

Department of Education Office of Civil Rights ("OCR") on May 7,

---

[45]    See id. at pp. 6-7.

[46]    Id. at p. 7; Ex. 18, Letter from Dr. Epstein to Plaintiff Raymond
dated May 5, 2003.

[47]    Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 4,
Letter re: complaint 06042069 from Stacy Lara to Jay Gogue dated Apr. 8, 2005,
p. 7.

[48]    See id.

[49]    Id. at pp. 3-4; Ex. 19, Letter from Dr. Epstein to Plaintiff Raymond
dated Dec. 3, 2003.

[50]    Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 4,
Letter re: complaint 06042069 from Stacy Lara to Jay Gogue dated Apr. 8, 2005,
p. 4; see also Ex. 5A, Deposition of Maxine Epstein dated Jan. 27, 2009, p. 55
(stating that she sent the letter of dismissal to Plaintiff Eubanks).

[51]    Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 4,
Letter re: complaint 06042069 from Stacy Lara to Jay Gogue dated Apr. 8, 2005,
p. 4; see also Ex. 5A, Deposition of Maxine Epstein dated Jan. 27, 2009, p. 55
(stating that Defendant had no policy allowing for reinstatement).

2004, complaining of discrimination based on race and disability.[52] According to Dr. Epstein, she was not aware of Plaintiff Raymond's diagnosis until the OCR investigated his complaints of discrimination after his dismissal.[53] On April 8, 2005, the OCR issued the results of its investigation.[54] The OCR concluded that the evidence did not suggest that Defendant had discriminated against Plaintiff Raymond on the basis of race or disability.[55]

### 3.  Plaintiff Lara

Defendant admitted Plaintiff Lara, an Hispanic woman, to the GCSW doctoral program to begin in the fall semester of 2000.[56] She completed her coursework over the next two years with a grade point average somewhere between 3.5 and 3.7 and sat for the comprehensive examinations in the fall of 2002.[57] She did not request

---

[52]     See Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 4, Letter re: complaint 06042069 from Stacy Lara to Jay Gogue dated Apr. 8, 2005, p. 1.

[53]     See Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 5A, Deposition of Maxine Epstein dated Jan. 27, 2009, p. 51.

[54]     See Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 4, Letter re: complaint 06042069 from Stacy Lara to Jay Gogue dated Apr. 8, 2005.

[55]     See id. at pp. 6, 8.

[56]     Defendant's Motion for Summary Judgment, Docket Entry No. 47, Letter re: complaint 06042086 from Stacy Lara to Jay Gogue dated Apr. 8, 2005, p. 3; Ex. 8, Deposition of Plaintiff Lara, p. 10; Plaintiffs' Response to Defendant's Motion for Summary Judgment, Docket Entry No. 54, Ex. 2 (unnumbered), Verification of Plaintiff Lara, ¶¶ 2, 4.  Although the letter at Exhibit 3 clearly relates to Plaintiff Lara's OCR complaint, nowhere within the letter is she identified by name.  If the court's identification is incorrect, the parties should notify the court immediately.

[57]     See Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 6, Form A: Student Request to Take Full Comprehensive Examinations; Ex. 8, Deposition of Plaintiff Lara, pp. 10-11.

accommodations.[58]   Plaintiff Lara failed all four sections of the examinations.[59]   She met with Dr. Epstein to discuss the test, and Dr. Epstein told Plaintiff Lara that she needed a tutor for each of the sections of the examinations, that she had not learned anything in the time she was in the program, that she was not able to conceptualize at the doctoral level, and that she could not write.[60] At that meeting, Plaintiff Lara requested and received a year-long leave of absence.[61]   While on leave, Plaintiff Lara was not allowed to meet with professors or to use Defendant's facilities because she was not enrolled as a student.[62]

When she returned, Plaintiff Lara registered with the CSD and provided medical documentation that she had Crohn's disease.[63]   The

---

[58]     Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 3, Letter re: complaint 06042086 from Stacy Lara to Jay Gogue dated Apr. 8, 2005, p. 7; Ex. 8, Deposition of Plaintiff Lara, p. 7.

[59]     Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 3, Letter re: complaint 06042086 from Stacy Lara to Jay Gogue dated Apr. 8, 2005, pp. 3, 7; see also Ex. 5A, Deposition of Maxine Epstein dated Jan. 27, 2009, p. 22; Ex. 7, Letter from Dr. Epstein to Plaintiff Lara dated Nov. 20, 2002.

[60]     Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 8, Deposition of Plaintiff Lara, p. 21.

[61]     Id. at p. 24; see also Ex. 3, Letter re: complaint 06042086 from Stacy Lara to Jay Gogue dated Apr. 8, 2005, p. 3; Ex. 5A, Deposition of Maxine Epstein dated Jan. 27, 2009, p. 22.

[62]     Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 5A, Deposition of Maxine Epstein dated Jan. 27, 2009, pp. 23-24; Ex. 8, Deposition of Plaintiff Lara, p. 24.

[63]     Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 3, Letter re: complaint 06042086 from Stacy Lara to Jay Gogue dated Apr. 8, 2005, p. 7; Plaintiffs' Response to Defendant's Motion for Summary Judgment, Docket Entry No. 54, Ex. 2 (unnumbered), Verification of Plaintiff Lara, ¶¶ 3, 17. Crohn's disease is "a chronic inflammatory bowel disease of unknown origin, usually affecting the ileum, the colon, or both structures."   Mosby's Pocket Dictionary of Medicine, Nursing, & Allied Health (Mosby's) 238 (1st ed. 1990).

11

physician's letter stated that Plaintiff Lara had a ten-year history of Crohn's disease, which could cause sudden diarrhea, joint pain, fever, and difficulty standing, sitting, or typing.[64] The CSD recommended that Plaintiff Lara be allowed priority seating, breaks as needed, extended time for the closed-book sections, and the option of handwriting, rather than typing, her answers.[65] On the accommodation form, the CSD identified Plaintiff Lara's disability as "Health Impairment."[66] She requested to retake the examinations with the recommended accommodations.[67]

Dr. Epstein completed the instructor portion of the RITA form and included most of the recommendations outlined in the CSD's

---

"[F]requent attacks of diarrhea, severe abdominal pain, nausea, fever, chills, weakness, anorexia, and weight loss" are symptoms of the disease. See id. In the summary judgment record, Plaintiff Lara's condition is also referred to as ulcerative colitis. See, e.g., Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 5A, Deposition of Maxine Epstein dated Jan. 27, 2009, p. 19; Ex. 8, Deposition of Plaintiff Lara, pp. 5, 7. Ulcerative colitis is "a chronic, episodic, inflammatory disease of the large intestine and rectum" characterized by symptoms similar to those associated with Crohn's disease. See Mosby's at 915.

[64]     Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 3, Letter re: complaint 06042086 from Stacy Lara to Jay Gogue dated Apr. 8, 2005, p. 7; see also Ex. 8, Deposition of Plaintiff Lara, p. 9.

[65]     Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 3, Letter re: complaint 06042086 from Stacy Lara to Jay Gogue dated Apr. 8, 2005, p. 7; Ex. 10, Confidential Student Accommodation Form; see also Ex. 8, Deposition of Plaintiff Lara, p. 7; Plaintiffs' Response to Defendant's Motion for Summary Judgment, Docket Entry No. 54, Ex. 2 (unnumbered), Verification of Plaintiff Lara, ¶ 17.

[66]     Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 10, Confidential Student Accommodation Form.

[67]     Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 3, Letter re: complaint 06042086 from Stacy Lara to Jay Gogue dated Apr. 8, 2005, p. 7.

accommodation form.[68]   Although the printed form contained the statement that the instructor completing the form "agree[d] to the testing accommodations specified," priority seating and the option to handwrite the examinations were omitted from the approved accommodations.[69]   Tellingly, Dr. Epstein noted on the form that a computer diskette would be provided for each exam.[70]   Dr. Epstein's assistant communicated Dr. Epstein's denial of Plaintiff Lara's request to handwrite the examinations, explaining that they were always taken on computer.[71]

Plaintiff Lara took the comprehensive examinations at the CSD and was allotted seven hours for each of the three closed-book sections over a three-day period.[72]   At the time of the examinations, Plaintiff Lara did not request to handwrite the examinations.[73]   Plaintiff Lara failed two areas, policy and

---

[68]     See id. at p. 7; Ex. 10, RITA form.

[69]     See Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 3, letter re: complaint 06042086 from Stacy Lara to Jay Gogue dated Apr. 8, 2005, pp. 6-7; Ex. 10, RITA form.

[70]     Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 10, RITA form.

[71]     Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 8, Deposition of Plaintiff Lara, pp. 46, 51, 52; Plaintiffs' Response to Defendant's Motion for Summary Judgment, Docket Entry No. 54, Ex. 2 (unnumbered), Verification of Plaintiff Lara, ¶ 18.

[72]     Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 8, Deposition of Plaintiff Lara, pp. 48-49; Ex. 10, RITA form.

[73]     Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 8, Deposition of Plaintiff Lara, pp. 48-49, 51. Contrary to Plaintiff Lara's testimony, the OCR investigation report indicated that Plaintiff Lara asked Dr. Epstein before and during testing for permission to handwrite the test. See Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 3, Letter re:

integrative, of the closed-book portion.[74]  This resulted in her

dismissal from the doctoral program.[75]

Plaintiff Lara filed a complaint of discrimination with the

OCR on May 7, 2004.[76]  Also in 2004, Plaintiff Lara hired an

attorney who reached an agreement with Defendant.[77]  In a letter to

Plaintiff Lara, the dean of social work stated:

> In connection with the [OCR's] investigation of your
> complaint against the [GCSW], we learned for the first
> time of your contention that you were not provided all of
> the accommodations that you were entitled to during your
> retake of the comprehensive examinations in October 2003.
> Specifically, you have contended that you were not
> allowed to hand write [sic] the exams.
>
> Your Student Accommodation Form, containing the
> [CSD's] recommendations for accommodations, reflects,
> among others, the recommendation that you be permitted to
> hand write [sic] the exam.  The [RITA] form specific to
> the comprehensive examinations does not contain the hand
> writing [sic] accommodation.  It appears that the hand
> writing [sic] accommodation may have been inadvertently
> omitted from the RITA form.  You did not inform anyone in

---

complaint 06042086 from Stacy Lara to Jay Gogue dated Apr. 8, 2005, p.7.

[74]     Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 3,
Letter re: complaint 06042086 from Stacy Lara to Jay Gogue dated Apr. 8, 2005,
p. 4; Ex. 11, letter from Dr. Epstein to Plaintiff Lara dated Dec. 3, 2003.

[75]     Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 3,
Letter re: complaint 06042086 from Stacy Lara to Jay Gogue dated Apr. 8, 2005,
p. 4; see also Ex. 5A, Deposition of Maxine Epstein dated Jan. 27, 2009, p. 55
(stating that she sent the letter of dismissal to Plaintiff Lara); Ex. 11, Letter
from Dr. Epstein to Plaintiff Lara dated Dec. 3, 2003.

[76]     Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 8,
Deposition of Plaintiff Lara, p. 62; see also Ex. 3, Letter re: complaint
06042086 from Stacy Lara to Jay Gogue dated Apr. 8, 2005, p. 1.

[77]     See Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex.
8, Deposition of Plaintiff Lara, p. 58.

the [GCSW] or in the [CSD] of the omission at the time of the comprehensive exams in October 2003.[78]

The dean also noted that Plaintiff Lara did not raise the issue to anyone in the GCSW or the CSD at any time after the examinations and did not grieve or appeal any aspect of the examinations or the dismissal.[79]  "It is unfortunate that you did not give us the opportunity to correct this problem previously," he reflected.[80] Nevertheless, Defendant offered to strike the 2003 examinations results from Plaintiff Lara's file and to allow her to retake the examinations.[81]  Plaintiff Lara declined the offer.[82]

In April 2005, the OCR issued the results of its investigation.[83]  The OCR found that Plaintiff Lara was a member of a protected class based on both national origin and disability and that she had suffered adverse treatment, but that the other

---

[78]     Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 12, Letter from Ira Colby to Plaintiff Lara dated Dec. 22, 2004, p. 1; see also Plaintiffs' Response to Defendant's Motion for Summary Judgment, Docket Entry No. 54, Ex. 2 (unnumbered), Verification of Plaintiff Lara, ¶ 29.  Plaintiff Lara's name is redacted from the letter written by Ira Colby, but the court identifies it as the one sent to her based on the other summary judgment evidence.  If the court's identification is incorrect, the parties should notify the court immediately.

[79]     Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 12, Letter from Ira Colby to Plaintiff Lara dated Dec. 22, 2004, p. 1.

[80]     Id.

[81]     See id. at p. 2.

[82]     See Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 8, Deposition of Plaintiff Lara, pp. 58-59.

[83]     See Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 3, Letter re: complaint 06042086 from Stacy Lara to Jay Gogue dated Apr. 8, 2005.

15

students she identified as comparators were not similarly situated to her and were not treated better than she was.[84]

### 4. Plaintiff Eubanks

Plaintiff Eubanks, an African-American man, began at the GCSW in 1997 in the master's program and began the doctoral program in 2000.[85]  During Plaintiff Eubanks' course of study, he experienced conflicts with at least two different professors.[86]  Plaintiff Eubanks, who was known to be Muslim, was in the class of Monit Cheung ("Dr. Cheung") on the morning of September 11, 2001, when the terrorist attacks occurred, and Dr. Cheung became so upset about the attacks that she cancelled class.[87]  Later in the semester, he was the only student in Dr. Cheung's class that

---

[84]    Id. at pp. 4-5, 7-8; In her verification, Plaintiff Lara claimed that the OCR ruling was "that I had missed their 180[-]day limit," but could pursue suit on her own.  Plaintiffs' Response to Defendant's Motion for Summary Judgment, Docket Entry No. 54, Ex. 2 (unnumbered), Verification of Plaintiff Lara, ¶ 28.  The OCR letter does not mention missing such a deadline.  See Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 3, Letter re: complaint 06042086 from Stacy Lara to Jay Gogue dated Apr. 8, 2005.

[85]    See Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 13, Deposition of Plaintiff Eubanks, p. 8; Ex. 16, Letter from John Stephens to Plaintiff Eubanks dated Dec. 10, 2004, p. 1.  In his verification dated after his deposition, Plaintiff Eubanks stated that he attended GCSW beginning in the fall of 2002.  Plaintiffs' Response to Defendant's Motion for Summary Judgment, Docket Entry No. 54, Ex. 1 (unnumbered), Verification of Plaintiff Eubanks, ¶ 3.  The court assumes, for purposes of this Memorandum and Recommendation, that Plaintiff Eubank's verification statement is incorrect.  Otherwise, some of his allegations regarding events in 2001 make no sense.

[86]    See Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 5A, Deposition of Maxine Epstein dated Jan. 27, 2009, pp. 35-36; Ex. 13, Deposition of Plaintiff Eubanks, pp. 27-29.

[87]    Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 13, Deposition of Plaintiff Eubanks, p. 23.

received an "F" on a particular class assignment.[88]   Plaintiff

Eubanks expressed his dismay to two other faculty members, neither

of whom reviewed Plaintiff Eubanks' failing work but told him that

he was "one of the brightest students in this program" and that

they could not believe he would receive an "F" on any assignment.[89]

Plaintiff Eubanks then met with Dr. Cheung and told her, "I am

satisfied that, for whatever reasons, you are not capable of

evaluating my work fairly."[90]   According to Plaintiff Eubanks, it

was "common knowledge among the African-American students that Dr.

Cheung was racist against African[]Americans."[91]  Plaintiff Eubanks

was not the only African-American student in that class.[92]   He

complained to Dr. Epstein that he thought that Dr. Cheung might

have some "issues" with him that affected how she graded his work.[93]

Dr. Epstein spoke with Dr. Cheung and encouraged her and Plaintiff

---

[88]   Id.; see also Plaintiffs' Response to Defendant's Motion for Summary Judgment, Docket Entry No. 54, Ex. 1 (unnumbered), Verification of Plaintiff Eubanks, ¶ 13 (on page six of the verification, which contains repetitive paragraph numeration).

[89]   Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 13, Deposition of Plaintiff Eubanks, pp. 23, 24; see also Plaintiffs' Response to Defendant's Motion for Summary Judgment, Docket Entry No. 54, Ex. 1 (unnumbered), Verification of Plaintiff Eubanks, ¶ 14 (on page seven of the verification).

[90]   Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 13, Deposition of Plaintiff Eubanks, p. 25.

[91]   Id. at p. 26.

[92]   Id.

[93]   See Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 5A, Deposition of Maxine Epstein dated Jan. 27, 2009, p. 36.  Dr. Epstein could not recall what type of "issues" Plaintiff Eubanks thought Dr. Cheung had.  See id.

Eubanks to meet and discuss the conflict.[94]  The record does not reflect whether the meeting occurred, but Dr. Cheung did allow Plaintiff Eubanks to rewrite the paper and, ultimately, gave him a "B" in the course.[95]

After that incident, Plaintiff Eubanks' troubles with another professor, Avelardo Valdez ("Dr. Valdez"), began.[96]  Dr. Valdez made condescending remarks in a Spring 2002 class about Plaintiff Eubanks' belief that American social sciences are fundamentally racist.[97]  Another day in class, Dr. Valdez told the students that, when he first arrived in Houston at the downtown bus station, he noticed a lot of African-American men there and wondered, "[W]hy are all these black men down here?"[98]

Plaintiff Eubanks also heard about a conversation in 2003 between a student and Ira Colby ("Dean Colby"), the dean of the GCSW, during which Dean Colby expressed derogatory opinions of minority students.[99]  According to Plaintiff Eubanks' source, Dean Colby said, "[M]inority students in general, African-American

---

[94]     See id. at p. 37.

[95]     Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 13, Deposition of Plaintiff Eubanks, p. 27.

[96]     See id.

[97]     Id. at pp. 27-29.

[98]     Id. at p. 29.

[99]     See id. at pp. 14, 69-70; Plaintiffs' Response to Defendant's Motion for Summary Judgment, Docket Entry No. 54, Ex. 1, Verification of Plaintiff Eubanks, ¶ 19.

students in particular, don't have the intellectual wherewithal, in and of themselves, to get doctoral degrees[] and[,] as such, need special help."[100]   Dean Colby denied making the comment.[101]

In the fall of 2003, Plaintiff Eubanks took another course with Dr. Valdez, an independent study.[102]  Although Dr. Valdez spoke favorably about Plaintiff Eubanks' work throughout the semester, Dr. Valdez told Plaintiff Eubanks at the end of the semester, "[W]ell, you're not finishing; I'm not giving you a grade."[103]  When Plaintiff Eubanks confronted Dr. Valdez about the project, Dr. Valdez was "really, really aggressive and confrontational."[104] Plaintiff Eubanks left the meeting without resolving the dispute.[105]

After participating in Hajj, the Muslim pilgrimage to Mecca, Plaintiff Eubanks returned to campus and filed a grievance against Dr. Valdez.[106]  As part of the grievance process, Plaintiff Eubanks spoke with Dr. Valdez, who agreed to give Plaintiff Eubanks a "B"

---

[100]    Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 13, Deposition of Plaintiff Eubanks, p. 14.

[101]    Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 20, Deposition of Dean Colby, p. 50.

[102]    Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 13, Deposition of Plaintiff Eubanks, p. 29.

[103]    Id.; see also Plaintiffs' Response to Defendant's Motion for Summary Judgment, Docket Entry No. 54, Ex. 1 (unnumbered), Verification of Plaintiff Eubanks, ¶ 18.

[104]    Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 13, Deposition of Plaintiff Eubanks, pp. 29-30.

[105]    Id. at p. 30.

[106]    Id.

for the independent study course.[107]   Despite the belief that he deserved an "A," Plaintiff Eubanks accepted a "B" "[t]o make this matter go away."[108]   After those incidents Plaintiff Eubanks experienced a "chilliness" toward him by Drs. Cheung and Valdez, as well as by Dr. Cheung's husband, Patrick Leung ("Dr. Leung").[109]

Plaintiff Eubanks completed the coursework with a grade point average somewhere between 3.6 and 3.8 and sat for the comprehensive examinations in the spring of 2004.[110]   He failed the research and integrative sections of the comprehensive examinations.[111]

In July 2004, Plaintiff Eubanks sent the following e-mail to Dr. Epstein:

> Dr. Epstein:
> This past March I met with you concerning my grave disappointment with the changes made to the research comp exam.  As I articulated in our face-to-face meeting, the research exam favored Patti Aldrege, a White student, and disfavored me.  Your response to my complaint was two-fold.  Firstly, you told me I was, in your words, "way off on this one".  Secondly, you told me to wait and see what the results were, and if they were not to my liking I had the option to challenge the outcome.  Suffice it to say that I do not like the outcome, and as I expressed in a previous note to you and Dean Colby, I am sati[s]fied that there exist[s] within the GSSW a culture that favors White students and disfavors Black students, and that the

---

[107]   Id.

[108]   Id. at. p. 30-31.

[109]   Plaintiffs' Response to Defendant's Motion for Summary Judgment, Docket Entry No. 54, Ex. 1 (unnumbered), Verification of Plaintiff Eubanks, ¶ 21.

[110]   Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 13, Deposition of Plaintiff Eubanks, p. 9.

[111]   Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 14, Letter from Dr. Epstein to Plaintiff Eubanks dated May 3, 2004.

comp exams are used to "discourage" Black students from
pursuing the requirements beyond the exam stage.  The
question I'd like an answer to is, how do I go about
challenging the exams I was failed on?  Thank you for you
attention to this matter.[112]

Dr. Epstein instructed Plaintiff Eubanks to consult the grievance

policy in the doctoral student handbook.[113]

In his deposition, Plaintiff Eubanks further explained his

complaint about the research examination.[114]   The closed-book

sections offered test takers a choice of questions to answer; the

research section include six choices from which students selected

two questions to answer.[115]   Students regularly studied questions

from prior comprehensive examinations in preparation for testing.[116]

For the spring examination, Dr. Leung wrote the research section

questions and "fundamentally changed" five of the six questions on

the test from questions that had been on prior examinations.[117]  The

only question that remained essentially the same as past years

dealt with "scale development," which was the subject of an

independent study that Patty Aldredge ("Aldredge") had completed

---

[112]    Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 15,
E-mail exchange between Plaintiff Eubanks and Dr. Epstein dated July 28, 2004.

[113]    Id.

[114]    See Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex.
13, Deposition of Plaintiff Eubanks, pp. 36-45.

[115]    Id. at pp. 38, 43-44.

[116]    Id. at p. 38.

[117]    See id. at pp. 38-39.

with Dr. Leung.[118]    As Aldredge was a white student and the only other test taker for the spring of 2004, Plaintiff Eubanks surmised, the test was designed to favor her in retaliation for his confronting Dr. Leung's wife, Dr. Cheung, about giving him an "F" in 2001.[119]

On September 16, 2004, Plaintiff Eubanks filed a complaint with the OCR, claiming that Defendant discriminated against him based on his race.[120]  He presented three specific allegations:  1) A racially hostile environment existed at GCSW based on various remarks by professors; 2) The writing and grading of the examinations was biased and not anonymous; and 3) Defendant failed African-American students at a higher rate than white students on the comprehensive examination.[121]    The investigator contacted Plaintiff Eubanks for more information.[122]    As a result of that conversation, Plaintiff Eubanks decided not to pursue the complaint

---

[118]    Id. at p. 39; see also Plaintiffs' Response to Defendant's Motion for Summary Judgment, Docket Entry No. 54, Ex. 1 (unnumbered), Verification of Plaintiff Eubanks, ¶ 16.

[119]    Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 13, Deposition of Plaintiff Eubanks, pp. 36-38; Plaintiffs' Response to Defendant's Motion for Summary Judgment, Docket Entry No. 54, Ex. 1 (unnumbered), Verification of Plaintiff Eubanks, ¶ 15.

[120]    See Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 13, Deposition of Plaintiff Eubanks, p. 74; Ex. 16, Letter from John Stephens to Plaintiff Eubanks dated Dec. 10, 2004.

[121]    Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 16, Letter from John Stephens to Plaintiff Eubanks dated Dec. 10, 2004, pp. 1-3.

[122]    Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 13, Deposition of Plaintiff Eubanks, p. 75.

because he did not trust the investigator's attitude toward the allegations or her commitment to justice.[123]

Plaintiff Eubanks contacted Dr. Epstein in late November 2004 to request that she allow him to advance to the proposal stage of the doctoral program.[124]  He explained that the failing grades he received on the comprehensive examinations did not accurately reflect his work, that exam questions posed in the research section put him at a disadvantage, and that the subjective grading process disfavored some students.[125]  "As such," he concluded, "I am requesting that the failing grades be waived[] and that I be permitted to advance to the proposal stage."[126]

On December 10, 2004, the OCR issued a letter to Plaintiff Eubanks stating that it would not proceed further on his complaint unless he provided sufficient factual support for his belief that discrimination had occurred.[127]  The letter stated that the remarks about which Plaintiff Eubanks complained did not rise to the level of "severe, persistent or pervasive" so as to constitute a racially hostile environment and that the facts presented in support of his

---

[123]    See id. at pp. 75, 76-77.

[124]    See Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 17, E-mail from Plaintiff Eubanks to Dr. Epstein dated Nov. 27, 2004.

[125]    Id.

[126]    Id.

[127]    See Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 16, Letter from John Stephens to Plaintiff Eubanks dated Dec. 10, 2004, p. 1.

complaint were insufficient to support the finding of bias in the writing and grading of the examinations or a violation based on failure rate on the comprehensive examinations.[128]

On the same date of the letter, Plaintiff Eubanks requested a leave-of-absence form.[129] He was granted a leave of absence, during which time he considered his options.[130] Plaintiff Eubanks decided not to file a grievance based on the results of his examinations because he believed he was being "constructively dismissed."[131] On December 28, 2004, Plaintiff Eubanks sent an e-mail to Dr. Epstein, withdrawing from the doctoral program and followed up with a telephone call to confirm that he had taken all the necessary steps for withdrawal.[132]

In an undated letter, Plaintiff Eubanks wrote to Dean Colby and Dr. Epstein to express his concerns about discrimination.[133] In

---

[128]   Id. at pp. 2-3.

[129]   Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 17, Handwritten notation dated Dec. 10, 2004, on e-mail from Plaintiff Eubanks to Dr. Epstein dated Nov. 27, 2004. This exhibit, as with all of Defendant's exhibits, is not authenticated. The court relies on the information therein for background purposes only.

[130]   Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 13, Deposition of Plaintiff Eubanks, p. 64.

[131]   Id. at p. 49.

[132]   See id. at pp. 66-67; Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 17, E-mail from Plaintiff Eubanks to Dr. Epstein dated Dec. 28, 2004, and handwritten notation dated Jan. 10, 2005, on that e-mail. This exhibit, as with all of Defendant's exhibits, is not authenticated. The court relies on the information therein for background purposes only.

[133]   See Plaintiffs' Response to Defendant's Motion for Summary Judgment, Docket Entry No. 54, Ex. 1 (unnumbered), Verification of Plaintiff Eubanks, Attach. 1 (unnumbered), undated letter from Plaintiff Eubanks to Dean Colby and

addition to recounting his allegations of discrimination related to his encounters with Drs. Cheung and Valdez and to the changes in the questions on the research section, Plaintiff Eubanks noted anecdotally that the white students admitted at the same time as he had achieved greater success than the minority students of the same class and, expanding beyond his class, that the trend was evident over a period of several years.[134]   He concluded his letter by listing his prior academic achievements and stating, "Suffice it to say that research is my strength and the fact that I was failed on the two research exams speaks not to my intellectual wherewithal, but to the very subjective, biased nature of the exam evaluation 'process'."[135]

**B.   Procedural History**

When Plaintiffs filed their complaint on December 8, 2005, they sought a temporary restraining order and preliminary and permanent injunctions enjoining Defendant from denying Plaintiffs reinstatement, declaratory judgment that Defendant violated Plaintiffs' federal rights, and a monetary award of $475,000, plus attorney's fees.[136]   A week later, the court denied their motion for

---

Dr. Epstein.

[134]   See id. at pp. 1-2 (unnumbered).

[135]   Id. at p. 2 (unnumbered).

[136]   See Plaintiffs' Original Complaint, Docket Entry No. 1.

a temporary restraining order.[137]  After Defendant answered and the court entered a scheduling order, Defendant requested a two-month extension of the scheduling deadlines, which was granted.[138]

In November 2006, Defendant filed a motion to dismiss for want of prosecution.[139]   Plaintiffs responded in opposition to the motion explaining that their attorney had been ill and, concurrently, filed a copy of the settlement agreement they had proposed to Defendant in April 2006 and to which Defendant had not responded.[140]  In their proposal, Plaintiffs each sought immediate reinstatement to the program, conferment of a doctoral degree, six years to complete a dissertation, and $300,000 in "financial restitution."[141]  They also proposed that Defendant pay them $900,000 in pecuniary damages and $183,000 in attorney's fees and that it submit to an external review, publicly post statistical data, implement testing accommodations for students with disabilities, revamp its testing and grievance procedure, and

---

[137]   See Order dated Dec. 15, 2005, Docket Entry No. 6.

[138]   See Answer, Docket Entry No. 8; Scheduling Order dated Mar. 17, 2006, Docket Entry No. 11; Defendant's Motion to Extend Docket Control Order, Docket Entry No. 12; Order dated Sept. 28, 2006, Docket Entry No. 13.

[139]   See Defendant's Motion for Involuntary Dismissal, Docket Entry No. 14.

[140]   See Plaintiffs' Motion in Opposition to Defendant's Motion for Involuntary Dismissal, Docket Entry No. 15; Plaintiffs' Proposed Settlement Agreement, Docket Entry No. 16.

[141]   Proposed Settlement Agreement, Docket Entry No. 16, pp. 3-5.

26

institute a student mentor program.[142]   In exchange, Plaintiffs agreed to dismiss the lawsuit.[143]

Before the court ruled on Defendant's motion, the parties consented to proceed before the magistrate judge.[144]   Plaintiffs' counsel filed a motion to withdraw as attorney and to stay the case.[145]   The court granted the motion and gave Plaintiffs sixty days to retain new counsel.[146]   On March 26, 2007, after the sixty-day period had expired without the entry of a new attorney, the court granted Defendant's motion and dismissed the case.[147]

Plaintiffs filed a motion for new trial, which the court denied, and Plaintiffs appealed the court's dismissal to the Fifth Circuit Court of Appeals.[148]   In May 2008, the appellate court reversed the court's ruling and remanded the case for further proceedings.[149]   The Fifth Circuit found dismissal to be too harsh a result under the circumstances.[150]

---

[142]   Id. at pp. 5-7.

[143]   Id. at p. 8.

[144]   See Consent form, Docket Entry Nos. 21, 23; Order of Reference, Docket Entry No. 24.

[145]   See Plaintiffs' Opposed Motion to Stay, Motion to Withdraw as Attorney, Docket Entry No. 25.

[146]   See Minute Entry Order dated Jan. 10, 2007, Docket Entry No. 26.

[147]   See Order of Dismissal and Final Judgment, Docket Entry No. 27.

[148]   See Plaintiffs' Motion for New Trial, Docket Entry No. 28; Order dated Apr. 11, 2007, Docket Entry No. 31; Notice of Appeal, Docket Entry No. 32.

[149]   See Judgment, Docket Entry No. 39.

[150]   See Fifth Circuit Opinion, Docket Entry No. 38, pp. 2-3.

Shortly after remand, this court entered a revised scheduling order and addressed discovery disputes.[151]  Defendant filed the presently pending motion for summary judgment in April 2009.[152]  After completing the briefing on Defendant's motion, Plaintiffs' second attorney moved to withdraw because of lack of cooperation from Plaintiff Raymond.[153]  The court denied that motion.[154]  Upon counsel's second motion in September 2009, the court held a hearing at which time Plaintiffs' counsel and Plaintiffs Lara and Eubanks addressed the court.[155]  Based on continuing conflicts between counsel and Plaintiffs, including state bar grievances filed by Plaintiff Raymond, the court granted counsel's motion to withdraw and allowed Plaintiffs to proceed pro se if they so chose.[156]  The docket reflects no activity in this case since that hearing.

Before the court addresses Defendant's Motion for Summary Judgment, it begins with Defendant's objections to the affidavit testimony of Plaintiffs Lara and Eubanks.

## II.  Defendant's Objections to Plaintiffs' Evidence

---

[151]  See Scheduling Order, Docket Entry No. 41; Minute Entry Order dated Dec. 19, 2008, Docket Entry No. 44.

[152]  See Motion for Summary Judgment, Docket Entry No. 47.

[153]  See Motion to Withdraw as Attorney, Docket Entry No. 56.

[154]  See Order dated May 27, 2009, Docket Entry No. 57.

[155]  See Second Motion to Withdraw as Attorney, Docket Entry No. 59; Minute Entry Order dated Sept. 16, 2009, Docket Entry No. 63.

[156]  See Discussion from hearing held on Sept. 16, 2009.

28

Defendant objects to substantial portions of Plaintiffs Lara and Eubanks' verifications.    Plaintiffs fail to respond to Defendant's objections.

Having reviewed the verifications, the court finds that they are replete with hearsay and speculation, as well as facts not within the declarants' personal knowledge.    The court **SUSTAINS** Defendant's objections to the portions of the verifications that contain incompetent summary judgment evidence.    To the extent that any unreliable statements are cited in this opinion, they are included as background information only.    The court relies on the portions of the statements that are competent evidence.

### III.   Summary Judgment Standard

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law.    Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Brown v. City of Houston, Tex., 337 F.3d 539, 540-41 (5th Cir. 2003).    A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit.    Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 271 F.3d 624, 626 (5th Cir. 2001).    To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party.    Anderson, 477 U.S. at

250; <u>TIG Ins. Co. v. Sedgwick James of Wash.</u>, 276 F.3d 754, 759 (5th Cir. 2002).

The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues.  <u>Celotex Corp.</u>, 477 U.S. at 323; <u>Topalian v. Ehrman</u>, 954 F.2d 1125, 1131 (5th Cir. 1992).  If the moving party can show an absence of record evidence in support of one or more elements of the case for which the nonmoving party bears the burden, the movant will be entitled to summary judgment.  <u>Celotex Corp.</u>, 477 U.S. at 322.  In response to a showing of lack of evidence, the party opposing summary judgment must go beyond the pleadings and proffer evidence that establishes each of the challenged elements of the case, demonstrating that genuine issues of material fact do exist that must be resolved at trial.  <u>Id.</u> at 324.

When considering the evidence, "[d]oubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party."  <u>Evans v. City of Houston</u>, 246 F.3d 344, 348 (5th Cir. 2001); <u>see also</u> <u>Boston Old Colony Ins. Co. v. Tiner Assocs. Inc.</u>, 288 F.3d 222, 227 (5th Cir. 2002).  The court should not "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence."  <u>Honore v. Douglas</u>, 833 F.2d 565, 567 (5th Cir. 1987).

However, the nonmoving party must show more than "some metaphysical doubt as to the material facts." <u>Meinecke v. H & R Block of Houston</u>, 66 F.3d 77, 81 (5th Cir. 1995). Conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation, or only a scintilla of evidence will not carry this burden. <u>Brown</u>, 337 F.3d at 541; <u>Ramsey v. Henderson</u>, 286 F.3d 264, 269 (5th Cir. 2002). The court must grant summary judgment if, after an adequate period of discovery, the nonmovant fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp.</u>, 477 U.S. at 322.

## IV. Analysis

Based on the deposition testimony and the OCR complaints, the court has determined that Plaintiff Raymond is complaining of race and disability discrimination, Plaintiff Lara is complaining of gender, national origin, and disability discrimination, and Plaintiff Eubanks is complaining of race, gender, and religion discrimination.[157]

---

[157]    <u>See</u> Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 4, Letter re: complaint 06042069 from Stacy Lara to Jay Gogue dated Apr. 8, 2005, p. 1; Ex. 8, Deposition of Plaintiff Lara, p. 7; Ex. 13, Deposition of Plaintiff Eubanks, p. 7. Plaintiff Eubanks did not plead religion as a basis of discrimination, nor did he raise religion as an issue before the OCR. <u>See generally</u> Plaintiffs' Original Complaint, Docket Entry No. 1; Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 16, Letter from John Stephens to Plaintiff Eubanks dated Dec. 10, 2004.

Defendant moves for summary judgment on all of Plaintiffs'[158] causes of action, arguing that Plaintiffs cannot seek redress against Defendant for a violation of the U.S. Constitution, that Plaintiffs cannot produce any evidence of intentional discrimination to support their Titles VI and IX claims, and that Plaintiff Lara cannot fulfill her prima facie obligation on her disability claim.   Plaintiffs' response fails to address any of Defendant's legal arguments and, instead, recites general facts that are not anchored to any particular evidence.   The court addresses each argument.

**A.   <u>Section 1983</u>**

A plaintiff can establish a prima facie case under Section 1983[159] by alleging: (1) a violation of a federal constitutional or

---

[158]   Defendant outlines Plaintiff Raymond's contentions in the fact section of its motion, but states that he is "no longer part of this case." Defendant's Motion for Summary Judgment, Docket Entry Number 47, pp. 7-8. Although the parties' written and oral representations indicate that Plaintiff Raymond has not participated in the lawsuit for quite a long period of time and that he may now be incapacitated, the court has not dismissed him from this action.  On May 4, 2009, Plaintiffs' then counsel stated in a motion filed with the court that Plaintiff Raymond "ha[d] withdrawn from this case and undersigned counsel [would] be filing a Motion to Dismiss."  Plaintiffs' Unopposed Motion to Extend Time for Plaintiff to Respond to Defendant's Motion for Summary Judgment, Docket Entry No. 48, p. 1.  Counsel did not file a motion to dismiss Plaintiff Raymond and subsequently moved for withdrawal from representation of all plaintiffs, including Plaintiff Raymond.  <u>See</u> Motion to Withdraw as Attorney, Docket Entry No. 56; Second Motion to Withdraw as Attorney, Docket Entry No. 59. Plaintiffs Lara and Eubanks attended the hearing on the second motion to withdraw, but Plaintiff Raymond did not.  <u>See</u> Minute Entry Order dated Sept. 16, 2009, Docket Entry No. 63.

[159]   The provision reads, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws,

statutory right; and (2) that the violation was committed by an individual acting under the color of state law.   Doe v. Rains County Indep. Sch. Dist., 66 F.3d 1402, 1406 (5th Cir. 1995).   The statute creates no substantive right, but provides remedies for deprivations of rights created under federal law.   Graham v. Connor, 490 U.S. 386, 393-94 (1989).   The Eleventh Amendment to the United States Constitution,[160] as interpreted by case law, bars suits brought against states or state agencies by one of its citizens unless the state specifically waives its immunity or Congress, in enacting a particular statute, intentionally abrogates the states' sovereign immunity.   Will v. Mich. Dep't of State Police, 491 U.S. 58, 66 (1989).

Here, Plaintiffs alleged that Defendant violated their federal constitutional rights of equal protection and due process.[161]   They seek both monetary and injunctive relief.   Section 1983 provides the avenue of redress by which their constitutional claims may be asserted.   See 42 U.S.C. § 1983.   However, Defendant is a state

---

shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

[160]   The Eleventh Amendment reads: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

[161]   In their response to Defendant's summary judgment motion, Plaintiffs expanded on these allegations and Plaintiff Eubanks added the unpled allegation under Section 1983 that Defendant violated his right to free speech.  Because the court concludes that Plaintiffs cannot maintain Section 1983 claims against Defendant, it does not address the specifics of the alleged constitutional violations or the pleading deficiencies.

instrumentality and, therefore, cannot be sued pursuant to Section 1983, for either monetary or injunctive relief, unless the state has unequivocally waived immunity or Congress has clearly abrogated state immunity. See Tex. Educ. Code Ann. §§ 111.01-111.02; Will, 491 U.S. at 66; Lowery v. Univ. of Houston-Clear Lake, 82 F. Supp.2d 689, 692-93 (S.D. Tex. 2000).

Nothing in this case suggests that the State of Texas consented to Plaintiffs' suit or otherwise waived immunity, and Plaintiffs do not contend as much. The law is well settled that Congress did not override Eleventh Amendment immunity when it passed Section 1983. See Will, 491 U.S. at 66. Thus, neither one of the exceptions to Eleventh Amendment immunity is met here.

In a case with very similar facts to the one at bar, the Fifth Circuit Court of Appeals ("Fifth Circuit") addressed this issue and held that states and state agencies are immune from suit regardless of the relief sought. Clay v. Tex. Women's Univ., 728 F.2d 714, 715-16 (5th Cir. 1984). The court explained that a suit may be maintained against a state official in an official capacity for prospective injunctive relief, but that, in order to fit within that exception, the plaintiff must name the individual state official as a party to the suit. See id. (citing Ala. v. Pugh, 438 U.S. 781 (1978)).

Because Plaintiffs here seek relief only from the university, Plaintiffs' Section 1983 constitutional claims must be dismissed.

## B.  <u>Titles VI and IX</u>

To prevail under Title VI,[162] a private litigant must prove that: 1) the defendant engaged in intentional discrimination based on race, color, or national origin; and 2) the defendant received federal financial assistance.  42 U.S.C. § 2000d; <u>see also Alexander v. Sandoval</u> (hereinafter "<u>Sandoval</u>"), 532 U.S. 275, 280 (2001).  The United States Supreme Court has held that an aggrieved party can bring a private cause of action only for intentional discrimination (not discriminatory effect or impact).  <u>See Sandoval</u>, 532 U.S. at 280-81, 285-86, 293 (noting that the statute itself prohibits only intentional discrimination); <u>Alexander v. Choate</u> (hereinafter "<u>Choate</u>"), 469 U.S. 287, 293 (1985)(same).

Title IX[163] was patterned after Title VI and contains nearly identical language, except that it protects against gender discrimination.  <u>Compare</u> 42 U.S.C. § 2000d <u>with</u> 20 U.S.C. § 1681; <u>see also Sandoval</u>, 532 U.S. at 280.  Like Title VI, Title IX provides a private right of action and requires proof of intentional discrimination.  <u>See Sandoval</u>, 532 U.S. at 280; <u>Fort v. Dallas Indep. Sch. Dist.</u>, No. 95-10323, 1996 WL 167072, at *3, n.3

---

[162]   The text of the statute reads:  "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

[163]   The text of the statute reads:  "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681.

(Mar. 11, 1996)(unpublished)(mentioning split in circuits and citing Chance v. Rice Univ., 984 F.2d 151, 153 (5th Cir. 1993), as holding that intentional discrimination standard applies to Title IX claims).

Intentional discrimination is also the essential inquiry in employment-discrimination cases brought under Title VII of the Civil Rights Act of 1964 ("Title VII").[164]  See Roberson v. Alltel Info. Servs., 373 F.3d 647, 651 (5th Cir. 2004).  To evaluate allegations of discrimination under Title VI and Title IX, courts employ the analytical approach and legal authority used in Title VII cases.  See Bisong v. Univ. of Houston, 493 F. Supp.2d 896, 904-05 (S.D. Tex. 2007); Baldwin v. Univ. of Tex. Med. Branch at Galveston, 945 F. Supp. 1022, 1031 (S.D. Tex. 1996).

In the absence of direct evidence, courts analyze discrimination claims under the burden-shifting approach first articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and modified in Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003), and Rachid v. Jack In The Box, Inc., 376 F.3d 305 (5th Cir. 2004).  Under the "modified McDonnell Douglas approach," a plaintiff may trigger a presumption of discrimination by establishing a prima facie case.  Rachid, 376 F.3d at 312.  Once a plaintiff has established a prima facie case, the burden shifts to the defendant to proffer legitimate, non-discriminatory reasons for

---

[164]    42 U.S.C. §§ 2000e-2000e-17

its actions.  Id.  If the defendant satisfies this burden, then the presumption of discrimination dissolves.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43 (2000); Price v. Fed. Express Corp., 283 F.3d 715, 720 (5ᵗʰ Cir. 2002).

The plaintiff must then offer evidence to create an issue of fact "either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motives alternative)." Rachid, 376 F.3d at 312 (internal quotation and alteration marks omitted).  If the plaintiff shows that the illegal discrimination was a motivating factor, the defendant must respond with evidence that the same employment decision would have been made regardless of discriminatory animus.  Id.

To establish a prima facie case of discrimination in the academic setting, a plaintiff must demonstrate that she or he: (1) is a member of a protected class; (2) met the university's legitimate expectations; (3) suffered an adverse action; and (4) was expelled because of the protected characteristic or was treated less favorably than nearly identical, similarly situated individuals who were not members of the protected class.  See Bisong, 493 F. Supp.2d at 906 (citing McDonnell Douglas Corp., 411 U.S. at 802).  The United States Supreme Court, in the context of

37

constitutional torts, has cautioned courts against second-guessing a university's academic decisions.  See, e.g., Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 225 (1985)("When judges are asked to review the substance of a genuinely academic decision, . . . they should show great respect for the faculty's professional judgment.");  Bd. of Curators of the Univ. of Mo. v. Horowitz, 435 U.S. 78, 92 (1978)("Courts are particularly ill-equipped to evaluate academic performance.").

### 1.  Plaintiff Raymond

Defendant presents a general argument that the evidence in the case record concerning Plaintiff Raymond is insufficient to establish a prima facie case of discrimination based on race. Defendant notes that Plaintiff Raymond's legal counsel represented to the parties and the court that Plaintiff Raymond intended to seek dismissal of his claims, but filed no motion to that effect. Plaintiffs' response focuses on Plaintiffs Lara and Eubanks. Despite Plaintiffs' failure to respond to the summary judgment motion on Plaintiff Raymond's claims, the court reviews the evidence in favor of Plaintiff Raymond.[165]

---

[165]    The Local Rules for the Southern District of Texas state that failure to respond to a motion will be taken as a representation of no opposition.  L.R. 7.4.  Generally, the non-moving party has twenty days to file a response before the lack of response is considered a lack of opposition.  See L.R. 7.3.  However, because it would be improper to grant a motion for summary judgment merely because of lack of response, this court must carefully consider the merits of Plaintiff's motions for summary judgment.  Hibernia Nat'l Bank v. Administracion Cent. S.A., 776 F.2d 1277, 1279 (5th Cir. 1985); John v. La. Bd. of Trs. for State Colls. & Univs., 757 F.2d 698, 707-08, 709 (5th Cir. 1985).

As an African-American man, Plaintiff Raymond is a member of a protected class, and, as a dismissed doctoral student, he has suffered an adverse action.  The evidence is equally clear that he did not meet Defendant's academic expectations.  Defendant required that Plaintiff Raymond and all doctoral candidates pass all four sections of the comprehensive examinations within two tries.  Plaintiff Raymond failed all four sections of the examinations initially and failed two sections when he retested.  He does not meet the third element of a prima facie case.

Be that as it may, the court addresses the fourth element as well.  Plaintiff Raymond's Title VI claim cannot survive without evidence that Defendant dismissed him because of his race or treated him less favorably than nearly identical, similarly situated students who were not African American.  Plaintiff Raymond submitted no evidence of either.  Plaintiff Raymond has not submitted any evidence whatsoever that indicates race played a role in his dismissal.  In connection with his complaint filed with the OCR, Plaintiff Raymond identified six white students who took the comprehensive examinations within several years of when he took them.[166]  Although the OCR investigator compared each of them to Plaintiff and found none to meet the disparate treatment standard, she did not provide their names or any other identifying

---

[166]     See Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 4, Letter re: complaint 06042069 from Stacy Lara to Jay Gogue dated Apr. 8, 2005, p. 4.

information.[167]   Plaintiff Raymond has not submitted any summary judgment evidence from which the court can make an independent determination.

Because Plaintiff Raymond has failed to fulfill his prima facie obligation, his Title VI claim of race discrimination should be dismissed.

### 2. Plaintiff Lara

Defendant argues that the evidence demonstrates that Plaintiff Lara failed to meet Defendant's legitimate academic expectations and that she has nothing more than subjective musings to support a finding that she was treated less favorably than non-Hispanics or men.   Plaintiff Lara responds with several instances that she contends demonstrate disparate treatment:[168]   1) Defendant's examination grading system was not clearly defined and was not anonymous; 2) Defendant placed greater restrictions on Plaintiff Lara than other students who took leave; 3) Aldredge, a white woman, received more favorable treatment under similar

---

[167]   See id.

[168]   Plaintiff Lara apparently identified the same six white students in connection with her OCR complaint as did Plaintiff Raymond in his OCR investigation. Compare Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 3, Letter re: complaint 06042086 from Stacy Lara to Jay Gogue dated Apr. 8, 2005, pp. 4-6 (discussing the six comparators she identified) with id. at Ex. 4, Letter re: complaint 06042069 from Stacy Lara to Jay Gogue dated Apr. 8, 2005, pp. 4-6 (discussing, in nearly identical language, the six comparators he identified). The OCR found that the identified students were not similarly situated, but, more importantly, Plaintiff Lara does not present any evidence related to the six unnamed students that were addressed in the OCR decision. See Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 3, Letter re: complaint 06042086 from Stacy Lara to Jay Gogue dated Apr. 8, 2005, p. 6.

circumstances; and 4) Susie Matt ("Matt"), a white woman, passed despite receiving similar feedback from the graders.  Plaintiff Lara also complains that the professors did not prepare her for the comprehensive examinations as they promised in orientation that they would do and that Dr. Epstein made negative comments about Plaintiff Lara's skills after she failed the comprehensive examinations on her first try.  The court considers each, but first addresses whether the summary judgment evidence is sufficient to fulfill the other three elements of a discrimination claim.

Like Plaintiff Raymond, Plaintiff Lara can meet the first and third element of a prima facie case:  she is an Hispanic woman who was dismissed from Defendant's doctoral program.  She, also like Plaintiff Raymond, failed all four sections of the comprehensive examinations on her first try and failed two sections on her second try.  As explained in the student handbook, her inability to pass all four sections of the comprehensive examinations in two attempts resulted in her dismissal from the program.  Plaintiff Lara has presented no summary judgment evidence to counter this evidence that she did not meet Defendant's legitimate expectations.

Even though Plaintiff Lara cannot meet her prima facie burden on that basis alone, the court looks at her evidence of disparate treatment.  In order to meet the fourth element of a prima facie case, Plaintiff Lara must demonstrate that either Defendant dismissed her because she is Hispanic or because she is a woman or

41

Defendant subjected her to less favorable treatment than nearly identical, similarly situated non-Hispanic or male students. Plaintiff Lara produces no evidence directly connecting her dismissal with her race or gender, but argues that Defendant subjected her to disparate treatment.

The last two complaints listed above concerning the professors' teaching failures and Dr. Epstein's negative comments do not implicate disparate treatment. Plaintiff Lara does not identify any student who experienced more favorable treatment under the same circumstances. She does vaguely suggest, without citing a specific comparator, that Dr. Epstein referred her for more academic assistance than she would a non-Hispanic or a man. Even if true, that is hardly evidence of that she was treated *less* favorably in her dismissal for failing the comprehensive examinations. In fact, that support suggests Dr. Epstein's desire that Plaintiff Lara succeed on her second attempt.

Plaintiff Lara contends that the grading system was not clearly defined and was not anonymous, but offers no evidence to support that conclusion, to connect it with her dismissal, or to compare the grading of her test with students outside her protected class. With regard to the restrictions placed on Plaintiff Lara during her leave of absence, she identifies only one student that she believes received more favorable treatment; ironically, it is Plaintiff Eubanks. According to Plaintiff Lara, Dr. Epstein did

42

not impose the same restrictions on Plaintiff Eubanks when he applied for a leave of absence.  He is not a nearly identical, similarly situated individual.  Unlike Plaintiff, he did not apply in person and he withdrew from the program less than one month after he requested a leave of absence.

The remaining two comparators identified by Plaintiff Lara were white women.  Those comparisons do not aid her in establishing a Title IX prima facie case based on gender.  Moreover, with regard to Aldredge, Plaintiff Lara states in her verification only that Aldredge was treated more favorably without any detail.  That is far from sufficient to satisfy the fourth element of a prima facie case.

Plaintiff Lara provides more detail in her comparison to Matt. She asserts that she and Matt studied together, took the examinations at the same time, and received similar comments from the graders, but Matt passed all four of the sections while Plaintiff passed none.[169]  Plaintiff relies entirely on hearsay to support this claim.  Specifically, she testified that she spoke with Matt after they had received letters informing them of their grades and that they compared comments from the graders.[170]  Matt

---

[169]   See Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 8, Deposition of Plaintiff Lara, pp. 17-19; Plaintiffs' Response to Defendant's Motion for Summary Judgment, Docket Entry No. 54, Ex. 2 (unnumbered), Verification of Plaintiff Lara, ¶ 12.

[170]   Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 8, Deposition of Plaintiff Lara, p. 17.

told her, "I have similar comments, but I passed."[171]   Plaintiff
Lara did not recall whether she read the actual comments on Matt's
examinations.[172]  This reliance on vague comparisons and speculation
falls short of creating a fact issue on disparate treatment.

Plaintiff Lara's Title VI and Title IX claims should be
dismissed for failure to meet her prima facie burden.

### 3.   Plaintiff Eubanks

As with Plaintiffs Lara and Raymond, Defendant argues that
Plaintiff Eubanks cannot demonstrate that he met Defendant's
legitimate expectations and that he provides only personal beliefs
and anecdotal surveys as to the alleged bias of the comprehensive
examinations.  Overall, Plaintiff Eubanks alleges several instances
that he contends demonstrate race, religion, and gender bias:  1)
Dr. Cheung gave Plaintiff Eubanks a "F" grade; 2) Dr. Leung
significantly changed five of six question choices on the research
section, leaving one that favored the white woman who tested at the
same time as Plaintiff Eubanks; 3) Dr. Valdez made racial remarks;
4) Dean Colby made a racial remark; 5) the grading procedures for
the comprehensive examinations were biased and not really
anonymous; and 6) the minority students' failure rate was higher

---

[171]   Id.

[172]   See id.

than that of white students.[173]  The court addresses these in the context of a broader discussion of Plaintiff Eubanks' prima facie burden.

Plaintiff Eubanks, as an African-American Muslim man, meets the protected class element of a prima facie case under Title VI or Title IX.  He, like the other plaintiffs, did not meet Defendant's legitimate expectations.  Sitting for the comprehensive examinations only once, Plaintiff Eubanks failed two sections. Rather than retest, he requested that the requirement of passing all sections of the comprehensive examinations be waived for him. Shortly thereafter, Plaintiff Eubanks withdrew from the program. Plaintiff Eubanks produces no evidence that suggests any basis for questioning the grades he received on his comprehensive examinations.

Plaintiff Eubanks argues that his withdrawal amounted to constructive dismissal from the doctoral program.  Constructive dismissal from a doctoral program is tantamount to an adverse action by a university, sufficient to meet the third element of a discrimination claim.  <u>Estep v. Univ. of Tex. at Austin</u>, 1998 WL

---

[173]    Plaintiff Eubanks also argues that the changes made to the comprehensive examinations in 2008 implemented the suggestions that Plaintiffs made in their 2006 settlement proposal, and, thus, they are prevailing parties in this lawsuit.  The record does reflect that Defendant changed the structure of the examinations in 2008; it does not show, however, whether the changes were identical to those proposed by Plaintiffs.  Regardless, whether Plaintiffs demands for changes to the comprehensive examinations were ultimately adopted by Defendant does not affect any aspect of this lawsuit.  Being prevailing parties could be relevant only to the award of attorney's fees, which is no longer an issue in this case.  Besides, making changes to the comprehensive examinations was only one of many demands in Plaintiffs' 2006 settlement proposal.

327277, No. 97-50868, at *2 (5th Cir. June 5, 1998)(unpublished);
see also Brown v. Kinney Shoe Corp., 237 F.3d 556, 566 (5th Cir.
2001)(finding that, in the context of Title VII claims, a plaintiff
may be able to satisfy the third element of a discrimination claim
by showing that, although he resigned, he was constructively
discharged).  The essence of a constructive discharge allegation is
that the defendant made the plaintiff's conditions so intolerable
that the plaintiff was forced to withdraw involuntarily.  See id.
(addressing constructive discharge in the employment context).  The
resignation must be reasonable under the circumstances.  Barrow v.
New Orleans S.S. Ass'n, 10 F.3d 292, 297 (5th Cir. 1994).

The evidence shows that, after Plaintiff Eubanks failed two
sections of the comprehensive examinations, Defendant took no
action that created intolerable conditions for Plaintiff Eubanks.
In fact, Defendant allowed him, like all other students, the
opportunity to retake the failed sections.  Plaintiff Eubanks
argues that he did not accept the opportunity because he believed
that discrimination was part of the culture in the GCSW and that
Defendant used the comprehensive examinations to hinder African-
American students from successful completion of the doctoral
program.[174]

---

[174]   When asked in his deposition, "Did you feel that, at the end of 2004,
you had no choice but to withdraw?", Plaintiff Eubanks responded, not with an
answer indicting intolerable conditions, but by stating:

I felt like I was going to pursue redress or justice another way.
I was going to go another way.

46

Plaintiff Eubanks doubts the validity of the test results because he believes he was one of the brightest students in the program, that he excelled in research, and that the grading of the examinations was biased against African-American Muslim men.  These beliefs are nothing more that speculation and cannot support a finding of constructive dismissal.  <u>Cf.</u> <u>Lawrence v. Univ. of Tex. Med. Branch at Galveston</u>, 163 F.3d 309, 313 (5th Cir. 1999)(stating, in an employment discrimination case, that an employee's subjective belief that he was the victim of discrimination is insufficient to create an inference of discriminatory intent).

Plaintiff Eubanks also argues that the actions of Drs. Cheung and Leung created a hostile environment[175] that led to his decision to withdraw.   Plaintiff Eubanks complains that Dr. Cheung wrongfully gave him a grade of "F" on a class assignment.   He complained to Dr. Cheung, other professors, and Dr. Epstein.  Subsequently, Dr. Cheung allowed Plaintiff Eubanks to rewrite the paper and gave him a "B" in the course.   Despite the favorable

_____

. . . .

I felt like staying in the -- I felt like the likelihood of taking the comps again and being failed again was high enough that I was not willing to put in the time, the money, the effort; that I had another option I wanted to pursue.

Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 13, Deposition of Plaintiff Eubanks, pp. 63-64.

[175]     Plaintiff Eubanks did not raise a hostile environment claim in this case, but did present one to the OCR, which found that the evidence of hostility was not severe or pervasive enough to rise to the level of a racially hostile environment.

resolution of the conflict, Plaintiff Eubanks speculates that Dr. Cheung gave him an "F" because he was Muslim.[176]

According to Plaintiff Eubanks' theory, Dr. Cheung targeted him for dismissal, but she was too savvy to take any negative action against him directly.  Instead, Plaintiff Eubanks contends, she influenced her husband, Dr. Leung, to change in fundamental ways the research questions of the comprehensive examinations so that Plaintiff Eubanks would not pass.   Plaintiff Eubanks' suspicions are not borne out by any evidence of Dr. Cheung's animosity[177] or of a connection between the grade incident in 2001 and the 2004 comprehensive examinations.

In addition to specific actions, discriminatory comments, although not adverse actions in an of themselves, can support a claim of hostile environment or constructive discharge. See Estep, 1998 WL 327277, at *2 (citing Mattern v. Eastman Kodak Co., 104 F.3d 702, 707 (5th Cir. 1997), abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006). Discriminatory comments are relevant when they relate to the protected class of persons to which the plaintiff belongs, are made

---

[176]   Although not well articulated, this belief is apparently connected to Dr. Cheung's reaction to the terrorist attacks of September 11, 2001.  The purported connection is far too attenuated to serve as a basis for finding discriminatory intent.

[177]   Plaintiff Eubanks testified that Dr. Cheung was upset about the terrorist attacks and discontinued class on September 11, 2001, but did not claim that she made any discriminatory or derogatory comment about Muslims or any other protected class, in connection with the attacks.

by someone in a position to influence the challenged decision, and can be connected to the relevant time period.  See Russell v. McKinney Hosp. Venture, 235 F.3d 219, 225-26 & n.10, 229 & n.19 (5th Cir. 2000)(discussing stray remarks in the context of age discrimination claim).   When made by someone other than the decision maker, such remarks carry little weight, unless the speaker had influence over the decision maker.  Cf. Palasota v. Haggar Clothing Co., 342 F.3d 569, 578 (5th Cir. 2003)(discussing stray remarks in the context of age discrimination claim).

The alleged remarks by Dr. Valdez challenging Plaintiff Eubanks' belief that social sciences are racist and questioning why so many African-American men were at a downtown bus station both were made in the academic setting of a class discussion.   No evidence indicates that Dr. Valdez played any role in evaluating Plaintiff Eubanks' comprehensive examinations or exercised any influence over those who did.   Plaintiff Eubanks also fails to explain how comments made in 2002 forced him to withdraw from the doctoral program over two years later.

As for the remark allegedly made by Dean Colby regarding minority students' lower likelihood of success in doctoral programs, it is not supported by any competent summary judgment evidence.   The person who claimed to have heard Dean Colby utter

the  statement  has  not  submitted  testimony  to  that  effect.[178]
Plaintiff  Eubanks  admitted  that  he  did  not  hear  the  comment,  and
Dean  Colby  denied  making  it.   Under  the  circumstances,  Plaintiff
Eubanks'  testimony  that  he  heard  about  it  from  a  former  student  is
simply  not  reliable  and  is  not  sufficient  to  support  his  claim
beyond  summary  judgment.

Even  viewed  as  a  whole,  the  evidence  discuss  above  does  not
raise  a  question  of  hostile  environment,  much  less  one  of
constructive  discharge.   See  Landgraf v. USI Film Prods.,  968 F.2d
427,  430  (5th  Cir.  1992)(stating  that  constructive  discharge
requires  proof  of  "greater  severity  or  pervasiveness  of  harassment
than  the  minimum  required  to  prove  a  hostile  working  environment").
Plaintiff  Eubanks  is  unable  to  meet  the  third  element  of  a  Title VI
or  Title IX  discrimination  cause  of  action.

Continuing  on,  nevertheless,  to  the  fourth  element,  dismissal
based  on  a  protected  category  or  less  favorable  treatment,  the
court  understands  Plaintiff  Eubanks'  argument  to  be  that  Defendant
discriminated  against  African-American  Muslim  men  in  the  grading
procedures  of  the  comprehensive  examinations.    When  pressed,
Plaintiff  Eubanks  could  offer  no  evidence  of  actual  bias  in  the
grading  of  the  tests.    At  most,  he  raised  a  question  on  the
anonymity  of  the  grading  by  pointing  out  the  number  of  students

---

[178]    According to Plaintiffs' attorney, the witness, a former doctoral
student  at  GCSW,  discontinued  all  communication  with  Plaintiffs  and  their
attorney  after  the  discovery  period  expired.    See  Plaintiffs'  Response  to
Defendant's Motion for Summary Judgment, Docket Entry No. 54, p. 2 (unnumbered).

taking the tests was so low that the graders, who were familiar with the students, would know which examination belonged to which student.[179]   A lack of anonymity does not signal discrimination.

Plaintiff Eubanks contends, however, that the disparity in passing rates between white women and minorities is evidence of illegal bias.   In support of this contention, he relies on his own informal survey.   Based on his conversations with other students who took the comprehensive examinations within a year or two of him, he concluded that Defendant failed minorities at a much higher rate than white women.   The statistics show that only twenty-three students took the comprehensive examinations during the school years 2000-2004, and seventy-eight percent passed.   Sixty percent of African-American students and seventy-five percent of male students passed compared with ninety percent of white students and eighty-five percent of female students.   The difference in passage rates is not so statistically significant to raise a question of discriminatory intent in the absence of any other evidence.

Plaintiff Eubanks also calls attention to the fact that he did not pass the examinations while the only other spring 2004 test taker, a white woman, did pass.   He contends that Aldredge was similarly situated and was treated more favorably than he because one of the question choices related her area of specialty and

---

[179]   See Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 13, Deposition of Plaintiff Eubanks, pp. 46-47; Plaintiffs' Response to Defendant's Motion for Summary Judgment, Docket Entry No. 54, Ex. 1 (unnumbered), Verification of Plaintiff Eubanks, ¶¶ 7-10 (on page 5).

because she passed the comprehensive examinations.  The evidence in this area is not sufficient to reach such a conclusion.  The evidence does not reveal whether Aldredge actually answered the allegedly favorable question and does not explain how she was favored over Plaintiff on the other section that he failed. Without evidence that their examination responses were nearly identical, the difference in their treatment appears to be nothing more than an academic decision that cannot be second-guessed by this court.  Cf. Regents of Univ. of Mich., 474 U.S. at 225 (warning courts against second-guessing academic decisions);  Bd. of Curators of the Univ. of Mo., 435 U.S. at 92 (same).

Having failed to produce evidence in support of three of the four elements of a prima facie case for either his Title VI or his Title IX claim, both must be dismissed.

## C.  **Section 504**

Section 504[180] prohibits discrimination against students attending universities that receive federal financial assistance. See 29 U.S.C. §§ 794(a), (b)(2)(A).  The purpose of the Section 504, like that of Title II of the Americans with Disabilities Act ("ADA"),[181] is to eliminate discrimination against individuals with

---

[180]    The statute states:  "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C. 794(a).

[181]    42 U.S.C. §§ 12131-12165.

disabilities.  <u>Pace v. Bogalusa City Sch. Bd.</u>, 403 F.3d 272, 291 (5th Cir. 2005).  Section 504 incorporates the standards used in ADA cases,[182] which are subject to Title VII burden-shifting analysis. 29 U.S.C. § 791(g); <u>Daigle v. Liberty Life Ins. Co.</u>, 70 F.3d 394, 396 (5th Cir. 1995).

In order to establish a prima facie case of discrimination in the academic setting, a plaintiff must prove that:  1) she is a qualified individual under the statute; 2) she was excluded from participation in or denied the benefits of a federally funded school service, program, or activity or was otherwise discriminated against by the school; and 3) the exclusion, denial of benefits, or discrimination was by reason of their disability.  See <u>Lightbourn v. County of El Paso, Tex.</u>, 118 F.3d 421, 428 (5th Cir. 1997)(listing the elements of a disability discrimination lawsuit filed under the ADA).

Although Section 504 does not reach all instances of disparate impact, it does require universities to allow reasonable modifications as long as they do not cause a "fundamental alteration in the nature of a program." <u>Choate</u>, 469 U.S. at 300 (quoting <u>Se. Cmty. Coll. v. Davis</u>, 442 U.S. 397, 410 (1979)). Identifying a balance between "the statutory rights of the handicapped to be integrated into society and the legitimate

---

[182]   "The primary difference between the ADA and § 504 is that § 504 applies only to recipients of federal funds." <u>Pace</u>, 403 F.3d at 291.  That difference is not an issue in this case.

interests of federal grantees in preserving the integrity of their programs," the Court explained its prior caselaw to require a recipient of federal funding to make reasonable, but not fundamental or substantial, modifications to accommodate persons with disabilities. <u>Choate</u>, 469 U.S. at 300 (discussing <u>Se. Cmty. Coll.</u>, 442 U.S. at 412-13). In other words, the disabled student is entitled to meaningful access to the benefit of the academic program. <u>See Choate</u>, 469 U.S. at 301.

Defendant argues that Plaintiff Lara[183] cannot meet all of the elements of a prima facie case because she failed to timely and appropriately challenge the denial of her request to handwrite the comprehensive examinations and because she provided no evidence that her answers would have been different if she had been allowed to handwrite the tests. Defendant argues that it accommodated "the major test-taking difficulties."[184] Because Defendant does not argue that Plaintiff Lara is not a qualified person with a disability or that the alleged denial of benefits was not by reason of Plaintiff Lara's disability, the court assumes those two elements of a prima facie case are met and focuses only on the

---

[183] Plaintiff Raymond produced no evidence or argument in support of his disability discrimination claim. The summary judgment record reflects that he received all of the accommodations that he requested. <u>See</u> Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 4, Letter re: complaint 06042069 from Stacy Lara to Jay Gogue dated Apr. 8, 2005, pp. 6-7. Plaintiff Eubanks has not brought a disability discrimination claim. Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 13, Deposition of Plaintiff Eubanks, p. 8.

[184] Defendant's Motion for Summary Judgment, Docket Entry No. 47, p. 18 (referencing "priority seating, breaks, and double time to thake the test").

second element, whether she was denied benefits of the doctoral program.

Plaintiff Lara followed the procedures outlined in the handbook for students seeking accommodations: she contacted the CSD; provided medical documentation of her disability; and submitted the CSD recommendations to Dr. Epstein. Whether intentional or inadvertent, Dr. Epstein omitted the requested accommodation of handwriting the examinations.[185] Plaintiff Lara testified that she specifically inquired about handwriting the examinations and was informed, by Dr. Epstein's assistant, that Dr. Epstein denied the request because students always completed the tests on computer.

Although Plaintiff Lara admitted in her deposition that she did not know prior to taking the examinations whether all of those hours of handwriting would avoid cramping, but thought the finger movement of typing would be more difficult.[186] She also could not swear that she would have been able to write more or that her answers would have been different.[187] She could only attest to the fact that she was in pain.[188] She asserts that "hand[]writing the

---

[185]    Dr. Epstein also omitted the accommodation of priority seating, but, as Plaintiff Lara took the closed-book examinations at the CSD, this does not appear to have been an issue.

[186]    Defendant's Motion for Summary Judgment, Docket Entry No. 47, Ex. 8, Deposition of Plaintiff Lara, p. 48.

[187]    Id. at pp. 52-53.

[188]    Id. at p. 53.

answers would have decreased my pain level[,] and my cognition level would have increased."[189]

The court finds Plaintiff Lara's evidence sufficient to raise a question on the issue of reasonable accommodations. The fact finder will need to determine whether Defendant's actions denied Plaintiff Lara the benefits of its program. Other issues may come into play, such as whether typing the examinations was a requirement that was fundamental to the integrity of the doctoral program (an argument that Defendant does not make) and whether Defendant's belated offer to allow Plaintiff Lara to retake the test with the handwriting accommodation affects the remedies available to her. Defendant does not pursue its argument beyond the prima facie level of the burden-shifting analysis; therefore, the court need not do so either.

Defendant's summary judgment motion is denied with regard to Plaintiff Lara's Section 504 discrimination claim.

### V. Conclusion

Based on the foregoing, the court **GRANTS IN PART** and **DENIES IN PART** Defendant's motion for summary judgment.

**SIGNED** in Houston, Texas, this 3rd day of December, 2009.

Nancy K. Johnson
United States Magistrate Judge

---

[189]     Plaintiffs' Response to Defendant's Motion for Summary Judgment, Docket Entry No. 54, Ex. 2 (unnumbered), Verification of Plaintiff Lara, ¶ 19.